Commonwealth *vs.* Seymour G. Townsend.

Berkshire. December 5, 2008. - March 16, 2009.

Present: Marshall, C.J., Ireland, Spina, Cowin, & Cordy, JJ.

*Practice, Criminal,* Motion to suppress, Required finding, Instructions to jury, Capital case. *Search and Seizure,* Threshold police inquiry, Emergency, Reasonable suspicion. *Constitutional Law,* Search and seizure. *Homicide. Evidence,* Motive. *Malice.*

A Superior Court judge properly denied the criminal defendant's pretrial motion to suppress evidence that police seized during a warrantless entry into the defendant's apartment, as well as to suppress statements that the defendant made in the course of the ensuing investigation on the ground that those statements were "fruit of the poisonous tree," where the entry was constitutionally proper under the emergency exception to the warrant requirement, as the facts known to the police at the time of their entry warranted their having a reasonable belief that the victim was inside the apartment and in need of immediate assistance. [424-427]

At the trial of an indictment charging the defendant with murder in the first degree, sufficient evidence of malice existed to support a conviction on a theory of extreme atrocity or cruelty [427-429]; likewise, sufficient evidence existed to support a conviction on a theory of deliberate premeditation [429].

At a murder trial, the judge's instruction to the jury adequately covered the element of deliberate premeditation [429-430]; moreover, the judge's failure, in instructing the jury on malice aforethought with regard to murder committed with deliberate premeditation, to give a complete definition of specific intent did not create a substantial likelihood of a miscarriage of justice, where another instruction effectively required the jury to find first prong malice [430].

Indictment found and returned in the Superior Court Department on March 23, 2006.

A pretrial motion to suppress evidence was heard by *Daniel A. Ford,* J., and the case was tried before *Judd J. Carhart,* J.

*Stewart T. Graham, Jr.,* for the defendant.

*David F. Capeless,* Assistant District Attorney, for the Commonwealth.

Ireland, J. Based on the stabbing of his estranged wife,

Michelle Townsend, that occurred in the early morning of March 3, 2006, a jury convicted the defendant of murder in the first degree on the theories of deliberate premeditation and extreme atrocity or cruelty. Represented by new counsel on appeal, the defendant argues error in (1) the denial of his motion to suppress evidence and statements; (2) the denial of his motion for required findings of not guilty; and (3) the trial judge's instructions to the jury. We affirm the defendant's conviction and discern no basis to exercise our authority under G. L. c. 278, § 33E.

The jury could have found the following. The victim and the defendant were married in 2003 after they had dated for about one year. At the time of their marriage, the victim had three children. After they married, the victim and the defendant had a daughter together.

During their marriage, the victim and the defendant often fought, verbally and physically. Friends and family, on multiple occasions, observed injuries to the victim, which the victim sometimes attributed to having been caused by the defendant. On February 2, 2006, the victim obtained a protective order against the defendant.[1] In March, 2006, the defendant admitted to a friend of the victim that he had "abused" the victim.

The defendant and the victim lived together in a second-floor apartment at 111 Lincoln Street in Pittsfield. The victim left that apartment and moved into another apartment in Pittsfield on Dartmouth Street. Her friend, Kristen Gralia, lived with her in the Dartmouth Street apartment. The defendant remained at the Lincoln Street apartment (the defendant's apartment).

Over the years, the victim had intermittent problems with drugs, particularly cocaine. In January or February of 2006, the Department of Social Services obtained custody of the victim's four children. Two of the children went to live with the victim's mother; the other two were placed in foster care. The victim visited and telephoned the children at her mother's residence every day. The victim blamed the defendant for her having lost custody of her children; she wanted to regain custody of them, and was thinking about obtaining a divorce.

---

[1]The victim did not renew the protective order after its expiration on February 16.

The victim was last seen by those close to her on Thursday, March 2, 2006. Prior to midnight, Gralia saw the victim leave their apartment and drive off in her automobile. A couple of hours later, at approximately 2 A.M., March 3, the victim telephoned Gralia from the defendant's apartment. She and Gralia spoke for a few minutes. Gralia heard the defendant's voice in the background; it sounded loud and angry. The victim said she would meet Gralia for breakfast; she never did so.

An employee of a local bar saw the defendant arrive at the bar at about 11:30 P.M. on March 2. The defendant was wearing an orange and white jacket, orange and white baseball hat, and orange shirt. He left about one hour later. At approximately 1 A.M. (now March 3), the victim entered the bar, looked around, and left, staying for no longer than five minutes.

On March 3, when the victim did not return home, Gralia spoke with Michelle Matthews, a friend of the victim who lived in a downstairs apartment. The two women made some telephone calls trying to locate the victim. Gralia telephoned the defendant's cellular telephone and his apartment, but received no answer. In addition, the victim's mother attempted to contact the victim by calling her cellular telephone and home telephone. The victim did not answer.

On Saturday, March 4, Gralia and Matthews went to the Pittsfield police department. They recounted the victim's telephone call to Gralia. Officer Thomas Dawley was dispatched to the defendant's apartment. He went to the back parking lot and observed the victim's automobile. He did not see a green van, which was the vehicle used by the defendant. Officer Dawley went to the defendant's apartment, announced his presence, and knocked on the door. No one answered. He reported back to dispatch that there was no response.

After two additional, but unsuccessful, well-being checks were made by police during the weekend, Sergeant Matthew Hill was dispatched to the defendant's apartment on Monday, March 6. Sergeant Hill attempted unsuccessfully to gain entry into the apartment through a window. Consequently, the fire department was contacted to force open the front door, which opened into the kitchen. Once the front door was opened, Sergeant Hill saw a large amount of dried blood on the kitchen floor. By himself, he

proceeded into the apartment. Immediately past the doorway between the kitchen and the living room, Sergeant Hill found the victim lying face down on the living room floor with a sheet covering most of her body. (Her bare feet, on which there were bloodstains, were exposed.) He determined that the victim was deceased.

Bloodstains were found throughout the apartment, including in the kitchen, living room, bathroom, and a children's bedroom. Some of the bloodstains were apparent to the eye; others were visible through chemical enhancement. In the kitchen, there were bloodstains on the walls, on the floor, and on kitchen countertops. On the back of the front door to the apartment, which opened into the kitchen, there was blood spatter, smears of blood, and cast-off blood. A fingerprint of the defendant was recovered from the blood on the door as well as from the blood on the kitchen wall. Blood on the door was consistent with the victim's. Next to the kitchen sink, police recovered a bloody latex glove in which there was a bloody paper towel. Blood on the towel was consistent with the defendant's blood. In the bathroom, there were bloodstains in the bowl and countertop areas of the sink.

In the living room, there was blood spatter on the walls. A bloodstain on the wall was consistent with the victim's blood. There were bloodstains on a reclining chair, and blood smear on the back of another chair. On the couch, police recovered an orange and white jacket.

There were bloody footprints on the carpet in the living room leading to the children's bedroom, and then leading back into the living room. Some of the footprints led to a white plastic bag that contained the defendant's thumbprint. In this bag, police recovered a knife, a cotton blanket that was soaked with blood and had multiple holes throughout, a long-sleeve orange shirt, and a pair of brown and white boots. Bloodstains consistent with the victim's blood were found on the shirt and boots. On the knife, there were bloodstains, as well as tissue and hair. The tissue on the knife contained deoxyribonucleic acid (DNA) consistent with the victim's. Blood on the knife was consistent with both the victim's blood and the defendant's blood. In the defendant's bedroom, police recovered an orange and white baseball hat. There were no bloodstains in that room.

During their investigation, police recovered photographs of the defendant from the victim's Dartmouth Street apartment. The pictures depicted the defendant dressed in the orange and white jacket. They also found a joint petition for divorce, which was blank.

Police obtained video surveillance tapes from the bar at which the defendant and the victim were seen on March 2 and March 3. A tape recording captured an image of the defendant inside the bar wearing the orange and white jacket, orange and white hat, and orange shirt.

The victim died as a result of a loss of blood caused by fifty-eight knife wounds. She sustained multiple knife wound injuries[2] to her head, face, neck, shoulders, arms, hands, chest, and back, and had defensive wounds on her arms and hands. Approximately two-thirds of the victim's injuries were "serious," and potentially fatal if left untreated. The remaining less serious wounds, by themselves, would be potentially fatal if the bleeding were not stopped. The victim's injuries were consistent with wounds that could have been inflicted by the knife seized from the white plastic bag in the defendant's apartment. A toxicology screen revealed that cocaine and cocaine metabolite, as well as trace levels of alcohol, were in the victim's bloodstream at the time of her death.[3]

On March 3, the defendant fled in the green van to the borough of Queens in New York City, where he was arrested on March 23.[4] The following day, after being given Miranda warnings, the defendant agreed to speak with police. Detective Thomas Bowler of the Pittsfield police department conducted the interview (in New York City), which was recorded using a hand-held audio recorder.

The defendant told police that, on the evening of March 2, and into the early morning of March 3, he was at a local bar.

[2]Although the medical examiner testified, with respect to most of the knife wounds, about their length and depth, he did not consistently characterize the wounds as either lacerations or stab wounds.

[3]The victim had no fluid blood from which to take a sample for the purposes of a toxicology screen; instead, the medical examiner took a sample from a blood clot in the victim's body.

[4]Prior to his arrest, the defendant parked the van, removed its registration plates, and threw them away.

He was wearing the orange and white jacket, orange and white baseball hat, and orange shirt. After he returned home to his apartment, the victim showed up. She was acting "crazy," and was upset about the situation with the children. She remarked that she would not get the children back because she was "smoking crack" again and she was not going to stop. The victim threatened to kill the defendant.[5]

The defendant offered different accounts of what next took place. The defendant stated that while he was playing a video game, the victim slapped him. He jumped up and saw that the victim was holding a knife that she brought with her into the apartment. He grabbed for the knife and took it from her. The defendant's other version was that while he and the victim were arguing, she attacked him by trying to stab him. The defendant took the knife from her.

While taking the knife away from the victim, the defendant cut his finger. As he was holding the knife, the victim hit him. The victim said, "Kill me," and told the defendant to kill himself too. The defendant started to swing his hand that held the knife. The victim kept asking the defendant to kill her and told the defendant that she wanted him to die.

The victim was still alive after the defendant stopped stabbing her.[6] The defendant got scared and covered her. He left because he expected the victim to contact the police. Before he left, he put some of his bloody clothes, as well as the knife, in a bag.

The defendant did not testify. Through cross-examination of the Commonwealth's witnesses, defense counsel portrayed the victim as a "crack" cocaine addict who had been angry with the defendant on March 3, 2006, because she thought he had been "fooling around" with another woman. The victim had been "very territorial" of the defendant. She also blamed the defendant for having lost custody of her children. The stabbing resulted only after the victim had threatened to kill the defendant with a knife and tried to stab him first with it. Although the defendant was able to take control of the knife, the victim was attacking

---

[5]The defendant told police that, on a previous occasion, the victim had threatened him.

[6]The defendant did not recall details about the actual stabbing.

him. The defendant argued that, based on heat of passion on reasonable provocation or heat of passion induced by sudden combat, the killing amounted to nothing more than voluntary manslaughter.

1. *Motion to suppress.*[7] Citing both the Federal and State Constitutions, the defendant moved to suppress all evidence (including the victim's body) seized by the police during a warrantless entry into his apartment. The defendant also sought suppression of statements made by him in the course of the ensuing investigation as the "fruit of the poisonous tree." *Wong Sun* v. *United States*, 371 U.S. 471, 488 (1963). See *Commonwealth* v. *Bishop*, 402 Mass. 449, 452 (1988).[8] After an evidentiary hearing, the motion was denied in a written memorandum of decision by a judge who was not the trial judge. The motion judge concluded that the entry was constitutionally proper under the community caretaking exception to the warrant requirement. The defendant maintains on appeal that his motion should have been allowed because the warrantless entry was unlawful.

"When reviewing a motion to suppress, we accept the subsidiary findings of fact made by the motion judge and give deference to the judge's ultimate conclusions that are supported by the evidence." *Commonwealth* v. *McDermott*, 448 Mass. 750, 762, cert. denied, 128 S. Ct. 257 (2007). "Nevertheless, where the ultimate findings and rulings bear on issues of constitutional dimension, they are open for review." *Id.*, quoting *Commonwealth* v. *Haas*, 373 Mass. 545, 550 (1977), *S.C.*, 398 Mass. 806 (1986).

The motion judge's findings of fact, occasionally supplemented with undisputed evidence from the record, follow. Except where otherwise noted, all of the findings are supported by the evidence that the judge found credible, and we accept them.[9] See *Commonwealth* v. *Sparks*, 433 Mass. 654, 656 (2001), and cases cited.

---

[7] Some repetition of facts henceforth appear. However, "[e]vidence adduced at trial but not before the motion judge . . . cannot be determinative of the propriety of the motion judge's decision." *Commonwealth* v. *Ramos*, 402 Mass. 209, 216 (1988).

[8] The defendant acknowledged that there was no independent basis to suppress his statements.

[9] The defendant did not produce any witnesses at the evidentiary hearing.

In August, 2003, the victim and the defendant rented a second-floor apartment at 111 Lincoln Street, Pittsfield, from Ronald Palazzo. The building contained five apartments. Both the victim and the defendant executed the lease, and both of their names appeared on the mailbox for the apartment. At the time they executed the lease, or sometime thereafter, the victim and the defendant were married.

The victim moved out of the Lincoln Street apartment and moved into, and resided at, an apartment on Dartmouth Street in Pittsfield. The defendant remained at the Lincoln Street apartment and paid the rent. On occasion, the victim visited the Lincoln Street apartment.

The relationship between the victim and the defendant was stormy. The victim's friends and family believed that the defendant was abusive to her. They heard arguments between them and observed bruises on the victim's body. The victim had obtained a protective order against the defendant, and the police had been called to at least one incident of domestic violence. In August, 2005, the defendant was arrested at the Dartmouth Street apartment for slashing the victim's furniture with a sharp object.

The victim had four daughters. The defendant was the father of the youngest daughter. In March, 2006, the two eldest daughters were living with the victim's mother. The two youngest daughters were in foster care as a result of intervention by the Department of Social Services. The victim made it a practice to telephone her mother almost every day to check on the children.

The victim struggled with a serious drug problem and was heavily involved in cocaine use during the three to four months before March, 2006. The victim sometimes would go on "cocaine binges," which might last two or three days. When the victim was using cocaine, however, she usually would not be with the defendant.

On Thursday, March 2, 2006, the victim told her close friend, Michelle Mathews, that she was going out for the evening. The victim lived upstairs from Mathews in the Dartmouth Street apartment. Mathews never saw or spoke with the victim again.

At about 2 A.M. on March 3, the victim called Kristen Gralia. The victim shared her apartment with Gralia. The victim told

Gralia that she was at the Lincoln Street apartment, and Gralia could hear the victim arguing with the defendant about bail money. The victim agreed to meet Gralia for breakfast at 6 A.M., but the victim never showed up. Gralia relayed this information to Mathews.

Mathews called the cellular telephones of both the victim and the defendant, but received no answer. She telephoned the Lincoln Street apartment, but only was connected to an answering machine. Because Mathews knew that the victim had a drug habit, she contacted a number of drug dealers, but learned that none of them had seen the victim.

Mathews knew that the victim drove a silver Mercedes automobile. She also knew that the victim's mother had given the victim the use of a green Dodge Caravan van, and that the defendant usually drove that vehicle. On the evening of March 3, Mathews walked around to places the victim was known to frequent, but she did not observe the victim's automobile or the van at any of these locations. She talked to no one who had seen the victim on March 3.

On March 4, Gralia told Mathews that the victim's mother had been leaving messages for the victim on her answering machine. Mathews telephoned the victim's mother, who speculated that the victim might be on a cocaine binge. Mathews then telephoned the Pittsfield police department and informed an officer that the victim had not been home in two days. She told the officer that there was a long history of abuse between the defendant and the victim, and that the last time anyone had heard from the victim was when she telephoned Gralia at 2 A.M. on March 3. Mathews asked the officer to go to the Lincoln Street address to check for the victim and any of her vehicles. The officer dispatched Officer Thomas Dawley to the Lincoln Street premises. At the Lincoln Street apartment, no one answered Officer Dawley's knock. Officer Dawley did not observe a van outside the apartment. He reported these findings back to the officer who had dispatched him.[10] The findings were relayed to Mathews.

---

[10]The judge's finding that Officer Dawley did not find the van or the victim's automobile outside the Lincoln Street premises is clearly erroneous. Officer Dawley testified that he did observe the victim's automobile, and there was no evidence to the contrary. The error is of no consequence.

Because she was not satisfied, Mathews telephoned a friend and asked her to check the Lincoln Street premises. The friend indicated that the victim's automobile was there. Mathews went there herself and observed the victim's automobile. She noticed that there was no snow underneath the automobile, leading her to conclude that it had been parked there since before a recent snowfall. She looked inside the automobile and saw a full pack of cigarettes and some candy. That observation was of some significance to Mathews because she knew that when the victim was on a cocaine binge, her normal practice was to keep her candy and her cigarettes with her. Mathews then knocked on the door to the Lincoln Street apartment and received no answer.

At about 4:30 P.M. that day, Mathews went to the Pittsfield police station and spoke with the desk officer, Officer Richard Saldo. She told him that she was very concerned about the victim. Mathews explained that the last time anyone had spoken to the victim was at 2 A.M. on March 3, when the victim had made a telephone call from the Lincoln Street apartment, and that the victim was supposed to meet her roommate for breakfast that morning, but did not show up. She also detailed the history of abuse and issuance of protective orders involving the victim and the defendant. Mathews informed Officer Saldo that the victim's automobile was parked in the rear of the Lincoln Street premises, that it was snow covered, and that there was no snow underneath it. She emphatically expressed her belief that the victim might be inside the Lincoln Street apartment. Officer Saldo arranged for Officer Randy Wendling to meet Mathews at the Lincoln Street apartment.

A short time later, Mathews and Officer Wendling met outside the Lincoln Street apartment. Mathews stated that she was very concerned about the victim's well-being, and once again explained the history of violence between the victim and the defendant. She showed Officer Wendling the victim's automobile. Officer Wendling went upstairs and knocked on the apartment door, receiving no answer. He then spoke with a tenant in a first-floor apartment who stated that she had not seen the victim and had not heard any arguing or fighting in the recent past.

Officer Wendling reported his findings to Officer Saldo. Officer Saldo instructed him to locate the victim's mother and to

speak with her. The victim's mother told Officer Wendling that she had not spoken to her daughter since the morning of March 2, and indicated that she might be on a cocaine binge. She informed Officer Wendling that she normally talked to her daughter every day because she had custody of two of the victim's daughters. The victim's mother filled out a missing person report, which Officer Wendling brought to the police station. Officer Saldo entered the information from the report into a computer.

Later that night, Officer Saldo learned from another officer that there was a history of domestic abuse between the defendant and the victim. That information caused Officer Saldo "to develop a bad feeling." He began to believe that this was not a simple "missing person" case because such cases are normally resolved within one day.

On Sunday, March 5, Mathews telephoned the police department and asked if they had been to the "crime scene." The officer who answered stated that there was no reason at that time to believe that it was a crime scene. Mathews vehemently expressed disagreement with that assessment.

At 7 P.M. (on Sunday), Sergeant Mathew Hill, who was working as the desk sergeant, received a telephone call from the victim's sister, Brenda LeClair. LeClair stated that she was very concerned because no one had heard from the victim for several days. LeClair reported that the victim shared an apartment with the defendant at Lincoln Street, but that no one could find her either at that address or at the Dartmouth Street address where she actually resided. Sergeant Hill dispatched Officer John Bassi to the Lincoln Street address to do a "well-being check" on the victim. He instructed Officer Bassi to contact the landlord to obtain a key for possible future use if he was unable to enter the apartment. Sergeant Hill also ran a record check on the police department computer and learned that there had been at least one prior domestic violence incident involving the victim and the defendant.

When Officer Bassi arrived at the Lincoln Street apartment, he found the exterior door to the building was locked. He went to the rear of the building and knocked on the door to a first-floor apartment. The occupants informed him that, on the previ-

ous day, March 4, they had seen the victim at a store. They stated (which turned out to be erroneous) that she had driven by them in a green Dodge van, honked the horn, and waved. They also relayed that they were happy that the victim and the defendant had not been around recently because they were sick of all their arguing. Officer Bassi got the name of the landlord from them. He then called Palazzo and asked if he had a key to the apartment, and Palazzo replied that he did not. Officer Bassi reported this information to Sergeant Hill's replacement (Sergeant Hill had gone home).

On Monday, March 6, at about 9 A.M., Sergeant Hill received a call from the Department of Social Services asking for assistance. Two social workers were at the Lincoln Street apartment to check on the victim because she had not shown up for a visit with her children and they were unable to reach her. They were extremely concerned. Sergeant Hill went to the premises and learned that the victim's failure to meet with the social workers to see her children was very unusual and, in fact, had never occurred before. He tried the door to the apartment and found that it was locked. He climbed a fire escape and tried to, but could not, open a window. Sergeant Hill was unable to see inside the apartment. He instructed another officer to ask the fire department to come to pry open the door to the apartment. Sergeant Hill left briefly to respond to another call. When he returned, the fire department was just arriving. At Sergeant Hill's direction, the fire department pried the door open. Sergeant Hill's purpose was to determine if the victim was inside and if she was in need of medical assistance.

Once the door was open, Sergeant Hill observed a large amount of dried blood on the kitchen floor. He poked his head into the apartment, looked to the right, and observed the victim's body on the floor. He then entered the apartment and saw that the victim's body was covered, in part, by a sheet. He checked to see if the victim was alive and determined that she was not. He notified his supervisors at the police station of his observations and stood watch until investigators and the police chief arrived.

We conclude that the Commonwealth satisfied its burden of establishing that the officers' entry into the defendant's apartment fell within the emergency exception to the warrant

requirement.[11] Searches and seizures inside a home without a warrant are presumptively unreasonable under the Fourth Amendment to the United States Constitution and under its cognate provision in art. 14 of the Massachusetts Declaration of Rights. *Brigham City* v. *Stuart,* 547 U.S. 398, 403 (2006). Because "the ultimate touchstone of the Fourth Amendment is 'reasonableness,' the warrant requirement is subject to certain exceptions." *Id.* "The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency." *Commonwealth* v. *Knowles,* 451 Mass. 91, 96 (2008), quoting *Mincey* v. *Arizona,* 437 U.S. 385, 392 (1978). "Accordingly, [the police] may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Brigham City* v. *Stuart, supra.* See *Commonwealth* v. *Knowles, supra,* quoting *Commonwealth* v. *Bates,* 28 Mass. App. Ct. 217, 219 (1990) ("The emergency exception, which is closely related to the community caretaking function, 'applies when the purpose of the police [action] is[,] because of an emergency, to respond to an immediate need for assistance for the protection of life or property' ").

"For the emergency exception to apply, the Commonwealth has the burden of showing that authorities had a reasonable ground to believe that an emergency existed and that the actions of the police were [objectively] reasonable in the circumstances." *Commonwealth* v. *Knowles, supra. Commonwealth* v. *Morrison,* 429 Mass. 511, 515 (1999). See *Brigham City* v. *Stuart, supra* at 403-404 (rejecting notion that subjective motivation of officers has any bearing on reasonableness). See generally 3 W.R. LaFave, Search and Seizure § 6.6(a) (4th ed. 2004 & Supp. 2008). Reasonableness must be "evaluated in relation to the

---

[11]We reach this conclusion under both the Fourth Amendment to the United States Constitution and art. 14 of the Massachusetts Declaration of Rights, and note that the defendant did not argue that, in the circumstances of this case, art. 14 provides any greater protection than does the Fourth Amendment. In addition, because we hold that the initial entry was proper, we need not address the defendant's argument that all evidence thereafter obtained, including statements made by the defendant and evidence obtained pursuant to various search warrants, was tainted because it was "an exploitation of the illegal entry." See *Commonwealth* v. *Blake,* 413 Mass. 823, 830 (1992).

scene as it could appear to the officers at the time, not as it may seem to a scholar after the event with the benefit of leisured retrospective analysis." *Commonwealth* v. *Young*, 382 Mass. 448, 456 (1981). In addition, "[t]he role of a [police] officer includes preventing violence and restoring order, not simply rendering first aid to casualties . . . ." *Brigham City* v. *Stuart*, *supra* at 406.

At the time of the entry into the defendant's apartment, the facts then known to the police warranted them in having a reasonable belief that the victim was inside the defendant's apartment and in need of immediate assistance. As to the victim's location, when the victim was last heard from (by Gralia) at 2 A.M. on March 3, she was inside the defendant's Lincoln Street apartment. Further, her automobile had been parked outside the defendant's apartment for several days and, based on the weather conditions and the lack of snow underneath the victim's automobile, had not been moved. Friends and family of the victim had made repeated attempts to contact and locate the victim, all of which were unsuccessful.

The police knew that there had been a history of domestic abuse involving the defendant and the victim, and that the victim was in the defendant's apartment the last time she had been in contact with anyone. They also knew that the victim used cocaine and sometimes went on cocaine binges. The victim had not shown up for breakfast as planned with her roommate, and no one had heard from her in days. No one answered the repeated knocks made by the police on the door to the defendant's apartment. Further, and most important, the police received information from the Department of Social Services that the victim had missed a visit with her children, which previously had never occurred. The information from the Department of Social Services crystallized the emergency and gave the police objectively reasonable grounds to rule out the possibility of a cocaine binge and to believe that some harm had befallen the victim. Thus, at the time of entry, there existed objectively reasonable grounds for the police to believe that the victim was inside the defendant's apartment and was in trouble, whether injured by reason of the defendant's abuse or by reason of using cocaine. See *Commonwealth* v. *Ortiz*, 435 Mass. 569, 572-573 (2002); *Commonwealth* v. *Snell*, 428 Mass. 766, 775, cert. denied, 527 U.S. 1010 (1999).

The defendant claims that the emergency exception does not apply because prior to the entry (on the morning of March 6), the police had not treated the situation as an emergency. The fact that the officers let some time pass before entering the defendant's apartment does not automatically negate application of the emergency exception. See *Commonwealth* v. *Snell, supra* at 775-776.

We reject the defendant's contention that the exception cannot apply because the police were slow to act in effectuating the actual entry into the apartment. Sergeant Hill's first attempt to enter the apartment by other means, namely, through a window, was a reasonable attempt to gain immediate entry. That it was not successful did not negate the nature of the emergency. While Sergeant Hill did leave the scene to respond to another call, the defendant overlooks the facts that he was not gone long and he had directed another officer to arrange for the fire department to come to pry open the apartment door. When Sergeant Hill returned, the fire department was just arriving.[12] In these circumstances, the emergency was not negated, and the manner of entry was plainly reasonable.

2. *Sufficiency of the evidence.* The defendant argues that the judge erred in denying his motion for a required finding of not guilty because there was insufficient evidence to support a finding of extreme atrocity or cruelty, or a finding of deliberate premeditation.[13] In reviewing the denial of a motion for a required finding, we must determine "whether the evidence, in its light most favorable to the Commonwealth . . . is sufficient . . . to permit the jury to infer the existence of the essential elements of the crime charged [beyond a reasonable doubt] . . . ." *Commonwealth* v. *Latimore,* 378 Mass. 671, 676-677 (1979), quoting *Commonwealth* v. *Sandler,* 368 Mass. 729, 740 (1975).

---

[12]In light of the type of harm that likely befell the victim (injury from the defendant or from a drug overdose), it was also objectively reasonable for Sergeant Hill to believe that obtaining the fire department's help would provide more immediate assistance to the victim than would have time spent securing a warrant and, thus, that attempts to obtain a warrant would have been, in the circumstances, impracticable.

[13]The defendant moved for a required finding of not guilty at the close of the Commonwealth's case and at the close of all the evidence. We need only evaluate the evidence at the close of the Commonwealth's case because the defendant did not present any evidence at trial.

"The relevant question is whether the evidence would permit a jury to find guilt, not whether the evidence requires such a finding." *Commonwealth* v. *Brown*, 401 Mass. 745, 747 (1988). Moreover, "[a] conviction may be properly based entirely on circumstantial evidence so long as that evidence establishes the defendant's guilt beyond a reasonable doubt." *Commonwealth* v. *Martino*, 412 Mass. 267, 272 (1992). Where the evidence is largely circumstantial, "it is not essential that the inferences drawn should be the only necessary inferences . . . . It is enough that [the inferences] be reasonable and possible." *Id.*, quoting *Commonwealth* v. *Merrick*, 255 Mass. 510, 514 (1926). If conflicting inferences are possible from the evidence, "it is for the jury to determine where the truth lies." *Commonwealth* v. *Wilborne*, 382 Mass. 241, 245 (1981), quoting *Commonwealth* v. *Amazeen*, 375 Mass. 73, 81 (1978). We conclude that the motion was properly denied.

a. The defendant claims, with respect to the conviction of murder in the first degree committed by extreme atrocity or cruelty, that there was insufficient evidence of malice. The defendant contends that the evidence established that he acted impulsively, but not that he was able to reflect normally on his actions, his choices, and the consequences of his choices.

As the judge properly instructed the jury, malice required for a conviction of murder in the first degree committed with extreme atrocity "may be proved by evidence establishing any one of three facts beyond a reasonable doubt: if, without justification or excuse, (1) the defendant intended to kill the victim (the so-called first prong of malice), or (2) the defendant intended to do the victim grievous bodily harm (the second prong), or (3) in the circumstances known to the defendant, a reasonably prudent person would have known that, according to common experience, there was a plain and strong likelihood that death would follow the contemplated act (the third prong). *Commonwealth* v. *Grey*, 399 Mass. 469, 470 n.1 (1987)." *Commonwealth* v. *Sneed*, 413 Mass. 387, 388 n.1 (1992). In defining each prong of malice, the judge also stated that there must be an "absence of heat of passion caused by reasonable provocation or sudden combat." The defendant overlooks that, under this theory — extreme atrocity or cruelty — the requisite malice may be satisfied by

any one of the three prongs. Here, there was evidence that the victim sustained fifty-eight stab wounds, which included several defensive wounds. There was also blood evidence, namely, the victim's blood on the back of the front door in the kitchen and the victim's blood on the living room wall, as well as blood on the victim's bare feet, from which the jury could have reasonably inferred that the stabbing of the victim occurred not only in the living room, but also in the kitchen. Based on this evidence, the jury could have permissibly found that the defendant had sufficient time for reflection and to form the requisite malice. See *Commonwealth* v. *Novo*, 449 Mass. 84, 99 (2007); *Commonwealth* v. *Waters*, 420 Mass. 276, 280 (1995). The evidence did not "tend[] equally to sustain either of two inconsistent propositions," as in *Commonwealth* v. *Salemme*, 395 Mass. 594, 601 (1985), quoting *Commonwealth* v. *Fancy*, 349 Mass. 196, 200 (1965). We see no reason to disturb the jury's finding that the defendant acted with the requisite malice.

b. Based on the evidence cited above, we reject the defendant's challenge to the sufficiency of the evidence on the theory of deliberate premeditation. It is well settled that "the law does not require a particular length of time to show deliberate premeditation." *Commonwealth* v. *Phillips*, 452 Mass. 617, 635 (2008), quoting *Commonwealth* v. *Guy*, 441 Mass. 96, 101 (2004). "A plan may take only seconds to form." *Commonwealth* v. *Phillips, supra.* Deliberate premeditation may be inferred based on the nature and extent of a victim's injuries, as well as from other forensic evidence. See *id.*, and cases cited.

We add that, contrary to the defendant's contention, the jury were warranted in inferring motive. The Commonwealth's evidence sufficiently established that the defendant and victim had a hostile relationship that had deteriorated, and that the victim was considering a divorce. See *Commonwealth* v. *Marshall*, 434 Mass. 358, 361-362 (2001); *Commonwealth* v. *Gil*, 393 Mass. 204, 215-216 (1984); *Commonwealth* v. *Basch*, 386 Mass. 620, 622 (1982). Last, the evidence of deliberate premeditation did not "tend[] equally to sustain either of two inconsistent propositions," as in *Commonwealth* v. *Salemme, supra.*

3. *Jury instructions.* The defendant challenges the jury's instructions on deliberate premeditation and the malice require-

ment for murder in the first degree committed with deliberate premeditation. He did not object to the instructions on the grounds he asserts now. We thus review for a substantial likelihood of a miscarriage of justice pursuant to G. L. c. 278, § 33E. *Commonwealth* v. *Oliveira*, 445 Mass. 837, 842 (2006). "We look to the charge as a whole to determine whether it fairly instructs the jury." *Commonwealth* v. *Raymond*, 424 Mass. 382, 386 (1997), citing *Commonwealth* v. *Blanchette*, 409 Mass. 99, 105 (1991).

a. The defendant contends that the judge erred in failing to distinguish the concepts of deliberation and premeditation, which resulted in eliminating the deliberation requirement. There was no error. The judge's instruction tracked the Model Jury Instructions on Homicide 8-9 (1999), and adequately covered the element of deliberate premeditation.

b. The Commonwealth concedes that the judge, in instructing the jury on malice aforethought with regard to murder committed with deliberate premeditation, did not give a complete definition of specific intent.[14] Because, however, the judge gave a complete definition of deliberate premeditation that included an instruction that it constitutes "the deliberation and premeditation, then the decision to kill, and lastly, the killing in furtherance of the decision," "effectively requir[ing] the jury to find first prong malice," the error did not create a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *McMahon*, 443 Mass. 409, 418 (2005).

4. *G. L. c. 278, § 33E.* We have reviewed the entire record pursuant to our duty under G. L. c. 278, § 33E, and conclude that the interests of justice do not require the entry of a verdict of a lesser degree of guilt or a new trial.

*Judgment affirmed.*

---

[14]The judge correctly instructed that malice aforethought, with regard to murder committed with deliberate premeditation, "is defined as a specific intent to cause death," and that "[i]ntent refers to a person's objective or purpose." He then went on to define specific intent as "the act of concentrating or focusing the mind for some perceptible period. It is a conscious act with a determination of the mind to do an act. It is contemplation rather than reflex, and it must precede the act."