COMMONWEALTH *vs.* THOMAS KNOWLES.

Middlesex. December 3, 2007. - April 7, 2008.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, CORDY, & BOTSFORD, JJ.

*Constitutional Law,* Search and seizure. *Search and Seizure,* Threshold police inquiry, Automobile, Emergency, Reasonable suspicion, Plain view.

A District Court judge erred in denying a criminal defendant's motion to suppress drugs that a police officer found in the open trunk of the defendant's parked automobile subsequent to the officer's seizure of the defendant, where the officer's seizure of the defendant, based on an apparently anonymous telephone call to the dispatcher combined with the officer's observations of the defendant, was not supported by a reasonable suspicion of criminal activity [94], and was not justified by a community caretaking purpose, in that the officer lacked an objective basis for believing that the defendant's well-being or the safety of the public was in immediate jeopardy [94-96]; nor did the emergency exception to the reasonable suspicion requirement apply, given the lack of evidence that the officer was responding to an immediate need for protection of life or property [96]; moreover, there was no reasonable basis for the officer to believe that the defendant was armed and dangerous and thus a threat to the officer's personal safety [97-100].

The plain view doctrine was inapplicable to a police officer's seizure of drugs from the open trunk of a criminal defendant's parked automobile following the officer's illegal seizure of the defendant, who had been leaning into the trunk and, after noticing the officer's presence, threw an unidentifiable object into the trunk. [100]

COMPLAINT received and sworn to in the Malden Division of the District Court Department on September 23, 2002.

A pretrial motion to suppress evidence was heard by *Geoffrey C. Packard,* J., and the case was heard by *Brian R. Merrick,* J.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*Andrew S. Crouch* for the defendant.

*David Marc Solet,* Assistant District Attorney, for the Commonwealth.

CORDY, J. At 6:40 P.M., on a September evening, a Malden

police officer, on patrol, received a dispatch reporting a man in a white shirt and jeans "swinging a baseball bat" near the intersection of Ferry and Holyoke Streets. Fewer than ten seconds later, the officer turned the corner from Ferry Street onto Holyoke Street and observed a man fitting that description. The man was standing with his back to the officer's cruiser, leaning into the open trunk of an automobile. The officer observed that as the man leaned into the trunk, he placed a baseball bat up against a telephone pole adjacent to the automobile. There was no one else on the street. The officer pulled his cruiser across the street, diagonal to the man, and got out. The man stood up, turned and noticed the officer, reached into his right pocket, and threw "something" that the officer could not identify into the open trunk. The officer ordered the man to "stop," "step away from the car," and to "come towards" him with his hands out of his pockets. The man complied. As he walked toward the officer, other officers arrived on the scene. The officers then proceeded to "identif[y]" the man as Thomas Knowles,[1] after which the first officer left Knowles in the custody of the other officers and went to inspect the open trunk to determine what Knowles had thrown inside "to make sure it wasn't a weapon." He observed what he believed to be "small packages of heroin all rolled up," "a small baggy containing some white powder," and two other bags containing "an assortment of pills."

After this discovery, Knowles was placed under arrest and eventually charged with possession with intent to distribute a Class A substance; possession with intent to distribute a Class B substance; possession of a Class B substance having previously been convicted of a drug offense; and committing a violation of the drug laws within 1,000 feet of a school, all in violation of G. L. c. 94C. Knowles was also charged with being a disorderly person, but that charge was dismissed prior to trial.

Knowles filed a motion to suppress the drugs found in the trunk of his automobile, contending that their seizure violated his rights under the Fourth Amendment to the United States Constitution and art. 14 of the Massachusetts Declaration of Rights. An evidentiary hearing was held before a District Court

---

[1]Thomas Knowles resided at 204 Ferry Street, which is located at the corner of Ferry and Holyoke Streets.

judge, at which the arresting officer was the only witness. The judge apparently credited the uncontradicted testimony of the officer, whose testimony regarding the seizure of Knowles and the subsequent search of his trunk is summarized above.[2]

The judge denied the motion to suppress, concluding that the officer "was justified" in making "further inquiry" of the defendant, "had an objective basis for concern for his safety," and acted reasonably in ordering the defendant to step away from the vehicle and walk toward him with his hands out of his pockets. The judge made no finding whether or when Knowles was seized (prior to his arrest) or whether the officer had a reasonable suspicion that Knowles had committed, was committing, or was about to commit a crime prior to observing the drugs in the trunk.

Knowles was convicted of the charged offenses at a jury-waived trial. The Appeals Court affirmed the convictions and the denial of the motion to suppress. In an unpublished memorandum and order issued pursuant to its rule 1:28, the Appeals Court concluded that Knowles was "seized," in the constitutional sense, when the officer ordered him to stop where he was, step away from the car, and walk toward him with his hands out of his pockets, and that at the time of the seizure Knowles's conduct was not "indicative" of criminal activity. However, the Appeals Court concluded that the seizure was nonetheless justified as a "reasonable precaution[] for [the officer's] own safety," in conducting an investigation to "make sure that the defendant was not posing a danger to himself or others," analogizing the situation to a "well-being check," *Commonwealth* v. *McDevitt*, 57 Mass. App. Ct. 733, 736 (2003), and police "investigation of emergencies," *Commonwealth* v. *Davis*, 63 Mass. App. Ct. 88, 89-90 (2005).[3] We granted the defendant's application for further appellate review and now reverse.

---

[2]In his decision on the motion to suppress, the judge, without the benefit of the transcript, made several findings that were inconsistent with the uncontradicted testimony of the officer (e.g., that the officer "ordered the defendant not to close the trunk," and that the defendant leaned the bat against the telephone pole "in an apparent reaction" to the officer's presence). Because there was no evidence to support those findings, they were clearly erroneous. We accept the officer's testimony in its entirety as it appears the motion judge intended to do.

[3]The Commonwealth did not brief or argue this ground before the Appeals Court.

We agree with the Appeals Court that the defendant was "seized" when the officer ordered him to stop what he was doing, move away from the automobile, and walk toward him with his hands out of his pockets. *Commonwealth* v. *Barros*, 435 Mass. 171, 173-176 (2001). We also agree that in the absence of evidence that might place the defendant's actions in a more sinister context, the substance of the apparently anonymous call to the dispatcher combined with the officer's observations of the defendant's movements thereafter did not create a reasonable suspicion of criminal activity on which a "threshold inquiry" (or investigative stop) might have been lawful pursuant to *Commonwealth* v. *Silva*, 366 Mass. 402, 405 (1974) ("we have consistently sustained the right of a police office[r] to make a threshold inquiry where suspicious conduct gives the officer reason to suspect that a person has committed, is committing, or is about to commit a crime").[4] We disagree, however, that the exceptions we have carefully carved out for police officers performing their community caretaking function and for emergencies apply in these circumstances, or that the officer had an adequate basis to justify the seizure of Knowles out of a reasonable concern for his safety, at the time it was effectuated.

"Local police officers are charged with 'community caretaking functions, totally divorced from the detection, investigation or acquisition of evidence relating to the violation of a criminal statute.' " *Commonwealth* v. *Evans,* 436 Mass. 369, 372 (2002), quoting *Cady* v. *Dombrowski*, 413 U.S. 433, 441 (1973). In carrying out this function, an officer may, when the need arises, stop individuals and inquire about their well-being, even if there

---

[4]The Commonwealth suggests that a recent case decided by the Appeals Court is to the contrary, citing *Commonwealth* v. *Molligi*, 70 Mass. App. Ct. 108 (2007), for the proposition that the police officer had a reasonable suspicion to believe that Knowles was committing or had committed the crime of disorderly conduct. In that case, a citizen, who appeared anxious, approached a police cruiser and informed the officer that a man was holding a knife further down the street. The officer then observed a man on a street corner holding a knife in his hand. It was 2:30 A.M., in an area into which persons were leaving bars and after-hours establishments. *Id.* at 109. When the officer approached the man, he fled across the street, almost hitting the cruiser, and down a side street. *Id.* The circumstances plainly justified the police pursuit and arrest for disorderly conduct that followed. Just as plainly, those facts are not present here.

are no grounds to suspect that criminal activity is afoot. See *Commonwealth* v. *Murdough*, 428 Mass. 760, 763-764 (1999). An officer may take steps that are reasonable and consistent with the purpose of his inquiry, *Commonwealth* v. *Smigliano*, 427 Mass. 490, 499-501 (1998) (Fried, J., concurring), even if those steps include actions that might otherwise be constitutionally intrusive. See *Cady* v. *Dombrowski, supra* at 447; *Commonwealth* v. *Murdough, supra* (officers need not have reasonable suspicion to require driver in rest area to step out of vehicle in order to better assess whether he was in condition to resume driving); *Commonwealth* v. *Lubiejewski*, 49 Mass. App. Ct. 212, 216 (2000), and cases cited (under community caretaking doctrine, officers may, without reasonable suspicion of criminal activity, approach and detain citizens for community caretaking purposes). See also *Commonwealth* v. *Smigliano, supra* at 501-503 (Appendix), for a compilation of decisions holding that police officers may approach and detain citizens for community caretaking purposes. If an officer uncovers evidence of criminal activity while operating within the scope of this inquiry, it is admissible. *Commonwealth* v. *Leonard*, 422 Mass. 504, 509, cert. denied, 519 U.S. 877 (1996).

The decision to make a well-being check must be reasonable in light of an objective basis for believing that the defendant's safety and well-being or that of the public may be in jeopardy. *Commonwealth* v. *McDevitt, supra* at 736 n.5. The Commonwealth has the burden of demonstrating, by objective evidence, that the officer's actions were "divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Cady* v. *Dombrowski, supra* at 441. See *Commonwealth* v. *Sondrini*, 48 Mass. App. Ct. 704, 706-707 (2000) (finding that objective view of facts revealed that police were engaged in criminal investigation, motivated by search for evidence, rather than caretaking).

There is no objective basis present here for believing that the defendant's well-being or the safety of the public was in immediate jeopardy. Any objective view of the actions of the officer leads to the conclusion that he was in fact conducting a criminal investigation. After arriving at the scene, he quickly seized Knowles, made no inquiry about his well-being, and as soon

as other officers arrived and took charge of Knowles, he proceeded to examine the contents of the open trunk for evidence of criminal activity. Indeed, the officer himself never justified his seizure of the defendant on the ground that he was acting in his community caretaking capacity.

Similarly, there is no objective basis for believing that the officer was confronted with an emergency situation. "The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency." *Mincey* v. *Arizona*, 437 U.S. 385, 392 (1978), quoting *Wayne* v. *United States*, 318 F.2d 205, 212 (D.C. Cir.), cert. denied, 375 U.S. 860 (1963) (opinion of Burger, J.). Accord *Commonwealth* v. *Snell*, 428 Mass. 766, 774-775, cert. denied, 527 U.S. 1010 (1999) (warrantless entry of home justified where police had reasonable grounds to believe that victim of domestic violence might be injured or dead inside). The emergency exception, which is closely related to the community caretaking function, "applies when the purpose of the police [action] is . . . because of an emergency, to respond to an immediate need for assistance for the protection of life or property." *Commonwealth* v. *Bates*, 28 Mass. App. Ct. 217, 219 (1990) (describing emergency exception and limitations).[5] See *Commonwealth* v. *Davis*, 63 Mass. App. Ct. 88, 89-91 (2005) (emergency exception justified police stop of vehicle driven by driver reported to be drunk, where officer saw vehicle, confirmed registration plate number, and stopped vehicle for safety reasons where other vehicles were on road). For the emergency exception to apply, the Commonwealth has the burden of showing that authorities had a reasonable ground to believe that an emergency existed and that the actions of the police were reasonable in the circumstances. *Id.* at 89-90, and cases cited. As with the community caretaking function, this exception does not apply when the purpose of police action is to gather evidence of criminal activity, rather than to respond to an immediate need for protection of life or property. Here, there was no evidence that such a need existed.

---

[5]As the Appeals Court noted in *Commonwealth* v. *Bates*, 28 Mass. App. Ct. 217, 219 n.2 (1990), the emergency exception is often equated with the community caretaking function when public safety is involved.

The Commonwealth contends, however, that even in the absence of a community caretaking purpose, or an emergency situation that might have justified Knowles's seizure, the officer acted reasonably and out of an objective concern for his safety, by ordering Knowles to stop what he was doing, take his hands out of his pockets, and walk away from the vehicle toward the officer. We have recognized that in circumstances where an officer has a legitimate reason to be in the proximity of a person whom he reasonably believes is "armed and dangerous," the officer may take steps to ensure his safety and the safety of others during the encounter even in the absence of a reasonable suspicion of criminal activity. For example, in *Commonwealth* v. *Fraser*, 410 Mass. 541 (1991), we held that a patdown of the defendant's coat was permissible even though the officer "may not have had sufficient information to justify an investigative stop." *Id.* at 544-545 n.4. In that case, two officers were responding to a radio transmission about "a man with a gun" inside an automobile parked at a specific location in a "high crime area" of Boston. *Id.* at 542. When the officers arrived at the location, the automobile that the man had presumably been in was gone, but a group of young men had gathered. *Id.* As the officers got out of their vehicle to question the men, the defendant bent down behind a parked truck "as though to pick something up or put something down." *Id.* As one of the officers approached the defendant, he stood up with his hands in his coat pockets. The officer asked him to remove his hands from his pockets. *Id.* When the defendant did not remove his hands, the officer pat frisked him and found a loaded handgun. *Id.* at 542-543 & n.2. The court concluded that the officer's proximity to the defendant was justified by the legitimate need to investigate the report of an armed man at that location, that based on the situation confronting the officer he had a reasonable belief that the defendant was armed and that his safety was in danger, and that a protective frisk was consequently justified. *Id.* at 544-547.[6]

In *Commonwealth* v. *Pagan*, 63 Mass. App. Ct. 780 (2005),

---

[6]See *Commonwealth* v. *Rock*, 429 Mass. 609, 612-613 (1999) (patfrisk "supported by reasonable belief . . . that the defendant was armed and potentially dangerous," where police encountered two men running from

the Appeals Court reached a similar conclusion in an encounter that also began with an insufficient basis on which to justify an investigative stop. In that case, members of the Boston anti-crime unit were patrolling an area at night where there had been "activity between rival gangs," and "complaints of firearm related incidents." *Id.* at 781. The officers stopped their vehicle when they observed two men standing in the street next to a double parked vehicle with one of its doors open, blocking a lane of traffic. *Id.* The men made eye contact with the officers, after which one of them threw an object into the open automobile. *Id.* As the officers got out of their vehicle to inquire further, the defendant had "a look of panic on his face." *Id.* at 782. He turned, started to walk away, and reached toward his waistband. *Id.* The nearest officer called out "firearm" and grabbed the defendant around the waist, placing his hand over the defendant's hand. *Id.* A firearm was seized and the defendant arrested. *Id.* The court concluded that in the factual context confronting the officers — the defendant's reaching for his waistband at the same time that he turned and began to walk away from the officers, in a high crime area, after having thrown an object into the vehicle on their approach, and having attempted to avoid their gaze — they were "reasonably apprehensive that the defendant might be drawing or concealing a weapon," and were justified in believing their safety was at risk. *Id.* at 783. See *Commonwealth* v. *Fisher*, 54 Mass. App. Ct. 41, 43-44 (2002) (two officers patrolling "high crime area" where "firearm offenses were common" properly conducted protective frisk of individual, who on seeing police did U-turn and walked away

area of reported shooting, and defendant had bulge under shirt near right hip area that he attempted to conceal from officers); *Commonwealth* v. *Foster*, 48 Mass. App. Ct. 671, 672-673 (2000) (tip that defendant had been displaying gun at 5:30 A.M. at street corner in high crime area, on leaving after-hours party, justified reasonable belief by officers that defendant was "armed and dangerous" and therefore patfrisk at time of encounter). Contrast *Commonwealth* v. *Barros*, 435 Mass. 171, 178 n.9 (2001), quoting *Commonwealth* v. *Foster*, *supra* at 676, 677 (anonymous tip that defendant carrying gun did not constitute reasonable suspicion to conduct stop nor was patfrisk justified where there was no indication that defendant "was armed *and* dangerous" [emphasis in original], or that there had been "other incidents involving use of weapons in the neighborhood," or that police had reasonable suspicion that defendant "posed a threat to the public").

quickly, and who, when police approached to inquire further, made "quick movement into his waist area").

The decisions in these cases are highly fact specific. But an understanding of their facts is essential to gauging the circumstances in which protective steps involving the seizure (or patfrisk) of an individual may be reasonably undertaken in the absence of the requisite suspicion to justify an investigative stop. Too broad an application of this exception would undercut the important principle that intrusions on a citizen's liberty must ordinarily be based on reasonable suspicion that criminal activity is afoot.

In the case before us, the officer had a legitimate basis on which to approach Knowles. He was following up on the report of a man swinging a bat, and, having located the man, it was perfectly appropriate for the officer to inquire further of him. The context of that inquiry, however, was unlike that in *Commonwealth* v. *Fraser*, 410 Mass. 541 (1991), or *Commonwealth* v. *Pagan*, *supra* (or the other cases cited above). This was not a high crime area, the officer was not investigating the report of a crime of violence, he was not outnumbered, it was not late at night, and Knowles did nothing to suggest that he might be attempting to secure or draw a weapon.[7] Nor was there any other objective indication that Knowles was both armed *and* dangerous. See generally J.A. Grasso, Jr., & C.M. McEvoy, Field Encounters and the Frisk, Suppression Matters Under Massachusetts Law, 5-5 — 5-7 (2001).

Notwithstanding the absence of an adequate basis to believe that Knowles was armed and dangerous, it was understandable

---

[7]We agree with the Appeals Court that the defendant's tossing something into the trunk when he saw the officer approach him was not a "furtive gesture" that might justify the seizure. In this respect, the case is unlike a routine traffic stop where an officer's observation of an occupant reaching under the seat or concealing his hands would be a sufficient basis for the officer to be concerned for his safety and justify ordering the occupants out of the automobile before proceeding further. See *Commonwealth* v. *Torres*, 433 Mass. 669, 673-674 (2001) (officer stopping automobile for traffic violation justified, based on reasonable concern for safety, in ordering defendant to leave vehicle, where officer observed passengers in back seat bent over attempting to retrieve or conceal something); *Commonwealth* v. *Moses*, 408 Mass. 136, 138, 142 (1990) (defendant's ducking below dashboard sufficient to justify exit order based on officer's concern for safety).

for the officer to want to conduct the inquiry away from both the open trunk and the pole against which the baseball bat rested. If the officer had asked rather than ordered Knowles to step away from the area to speak to him about the matter, and if Knowles had declined to do so, that fact would have legitimately heightened the officer's concern that Knowles posed a danger to his safety, and might have tipped the scales in favor of the type of protective seizure employed here. Cf. *Commonwealth* v. *Fraser, supra* at 545-546 (defendant's refusal of request to remove hands from pockets factor in justifying protective frisk). What happened, however, is that Knowles was seized first, stopping him from doing anything (including presumably closing the trunk), and placed in the custody of other officers while the initial officer investigated what Knowles threw into the trunk. This was more than the circumstances justified for the protection of the officer, and beyond what we have held to be permissible in the absence of reasonable suspicion of criminal activity.

Having concluded that the seizure of Knowles was in violation of the protections against unreasonable searches and seizures embodied in the Fourth Amendment and art. 14, and that it preceded and facilitated the officer's investigation of the contents of the trunk of Knowles's automobile, we further conclude that the plain view doctrine does not apply. See *Commonwealth* v. *Helme*, 399 Mass. 298, 302-303 (1987) (where Commonwealth had no justification for initiating threshold inquiry of defendant by blocking his automobile, plain view doctrine may not be invoked to legitimize observations made when officers peered in windows). The motion to suppress should have been allowed.

*Judgments reversed.*

*Judgments for the defendant.*