APPEALS COURT 
 
 COMMONWEALTH vs. DEMOS D.,[1] a juvenile

 
 Docket:
 23-P-1151
 
 
 Dates:
 September 10, 2024 - January 17, 2025
 
 
 Present:
 Shin, Ditkoff, & Brennan, JJ.
 
 
 County:
 Essex
 

 
 Keywords:
 Delinquent Child. Juvenile Court, Delinquent child. Child Requiring Assistance. Search and Seizure, Protective frisk. Firearms. Practice, Criminal, Motion to suppress.
 
 

      Complaint received and sworn to in the Essex County Division of the Juvenile Court Department on December 12, 2022. 
     Indictment found and returned in the Essex County Division of the Juvenile Court Department on April 25, 2023.
     a pretrial motion to suppress evidence was heard by Karen Hennessy, J. 
     An application for leave to prosecute an interlocutory appeal was allowed by Serge Georges, Jr., J., in the Supreme Judicial Court for the county of Suffolk, and the appeal was reported by him to the Appeals Court.
     Jennifer D. Cohen, Assistant District Attorney, for the Commonwealth.
     Dennis M. Toomey for the juvenile.
     Afton M. Templin, Committee for Public Counsel Services, for youth advocacy division of the Committee for Public Counsel Services, amicus curiae, submitted a letter.
     DITKOFF, J.  A police officer encountering a sixteen year old juvenile who had been reported missing by his legal guardian decided to transport the missing juvenile to a police station and then contact his guardian to pick him up.  Prior to doing so, he pat frisked the juvenile and discovered a handgun.  The juvenile was charged in the Juvenile Court with unlawfully carrying a loaded firearm, G. L. c. 269, § 10 (n), unlawful possession of a large capacity weapon, G. L. c. 269, § 10 (m), unlawful possession of ammunition, G. L. c. 269, § 10 (h) (1), and, as a youthful offender, unlawfully carrying a firearm, G. L. c. 119, § 54; G. L. c. 269, § 10 (a).  After an evidentiary hearing, a judge suppressed all physical evidence arising from this encounter.  We conclude that transporting the missing juvenile to a police station to be picked up by his legal guardian was a proper act of community caretaking, and that any argument regarding the child requiring assistance statute, G. L. c. 119, § 39H, was not raised or adequately developed at the suppression hearing.  Further following the majority view that it is generally reasonable for a police officer transporting a person in a police cruiser pursuant to a valid act of community caretaking to pat frisk that person before transport, we reverse the suppression order.
     1.  Background.  At roll call at the Lawrence Police Department on the morning of December 9, 2022, officers were shown a photograph of the sixteen year old juvenile and informed that he had been reported as a missing juvenile by the Department of Children and Families (DCF).
     Later that morning, a Lawrence police officer observed an individual he had previously encountered and knew to be a gang member traveling as a passenger in a motor vehicle near the Essex Street public housing development.  The officer immediately called a detective in the gang unit to determine if there were any open investigations into the individual.  Although the detective stated there were none, he did inform the officer that he had recently seen the individual possessing a firearm in a social media post.[2]  The officer chose not to stop the vehicle.
     Around 1 P.M. that day, again near the Essex Street public housing development, the officer stopped the motor vehicle he previously had seen after witnessing it roll through a stop sign.[3]  The officer testified that the back seat passengers were "excessively moving," "ducking out of sight," and turning to look back at him.  Upon approaching the vehicle, the officer "immediately recognized" a back seat passenger as the missing juvenile identified at that day's morning roll call.  He also observed the known gang member in a different back seat, playing with an infant.
     After discussing the situation with his partner, the officer decided to remove the juvenile from the motor vehicle.  At the motion hearing, the officer explained that, in the case of a juvenile reported missing, he had been trained to "take him into custody and make sure that his well-being is good . . . take him back to the station, contact whoever reported him missing, and advise them that I located their missing juvenile."
     Upon returning to the vehicle, the officer asked the juvenile to exit the vehicle.  Intending to place the juvenile in his cruiser and transport him to a police station, the officer pat frisked the juvenile.  The officer did not ask the juvenile any questions.  The officer patted the juvenile's waistband area and felt an object that he immediately recognized by feel as the handle of a firearm.  The officer seized the firearm and then placed the juvenile under arrest.
     The juvenile subsequently filed a motion to suppress all physical evidence resulting from this encounter.  Concluding that the officer's actions were not a proper exercise of community caretaking (and that the police lacked reasonable suspicion to conduct an investigatory patfrisk), the judge granted the motion.  This appeal, authorized by a single justice of the Supreme Judicial Court, followed.
     2.  Standard of review.  "On appeal, we review a ruling on a motion to suppress by accepting 'the judge's subsidiary findings of fact absent clear error but conduct an independent review of [the] ultimate findings and conclusions of law.'"  Commonwealth v. Cintron, 103 Mass. App. Ct. 799, 801-802 (2024), quoting Commonwealth v. Polanco, 92 Mass. App. Ct. 764, 769 (2018).  "We 'leave to the judge the responsibility of determining the weight and credibility to be given oral testimony presented at the motion hearing.'"  Commonwealth v. Yusuf, 488 Mass. 379, 385 (2021), quoting Commonwealth v. Balicki, 436 Mass. 1, 4 n.4 (2002).
     3.  Community caretaking.  "Local police officers are charged with 'community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.'"  Commonwealth v. Evans, 436 Mass. 369, 372 (2002), quoting Cady v. Dombrowski, 413 U.S. 433, 441 (1973).  "Under the community caretaking function, an officer may, without reasonable suspicion of criminal activity, approach and detain citizens for community caretaking purposes."  Commonwealth v. Sargsyan, 99 Mass. App. Ct. 114, 116 (2021).  "The community caretaking doctrine is applicable principally to a range of police activities involving motor vehicles, in which there are objective facts indicating that a person may be in need of medical assistance or some other circumstance exists apart from the investigation of criminal activity that supports police intervention to protect an individual or the public" (citation omitted).  Commonwealth v. Fisher, 86 Mass. App. Ct. 48, 51 (2014).  Cf. Caniglia v. Strom, 593 U.S. 194, 199 (2021) (community caretaking, although applicable to vehicle searches, does not allow warrantless searches of homes).  When exercising a community caretaking function, "[a]n officer may take steps that are reasonable and consistent with the purpose of his inquiry, even if those steps include actions that might otherwise be constitutionally intrusive" (citation omitted).  Commonwealth v. Knowles, 451 Mass. 91, 95 (2008).
     "The decision to make a well-being check must be reasonable in light of an objective basis for believing that the defendant's safety and well-being may be in jeopardy."  Commonwealth v. McDevitt, 57 Mass. App. Ct. 733, 736 (2003).  "The Commonwealth has the burden of demonstrating, by objective evidence, that the officer's actions were 'divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.'"  Knowles, 451 Mass. at 95, quoting Cady, 413 U.S. at 441.  "So long as the officer's conduct at the outset and throughout the course of exercising a community caretaking function is justified by the doctrine, the law does not attach significance to the officer's subjective motives."  Fisher, 86 Mass. App. Ct. at 51.  Accord Commonwealth v. Murdough, 428 Mass. 760, 765 (1999) (reversing suppression order in community caretaking case based on officer's subjective intent; "if the objective circumstances justify the action taken, that is enough"); Commonwealth v. Gaylardo, 68 Mass. App. Ct. 906, 907 (2007), quoting McDevitt, supra ("The officer's 'subjective belief, even a compelling one, that the operator was engaged in illegal behavior does not affect our decision'").
     Here, the juvenile had been reported as a missing juvenile.  Upon discovering the missing juvenile, the officer had the authority -- and, indeed, would be expected -- to return the juvenile to his proper guardian.  See Matter of C.M.M., 503 S.W.3d 692, 698 (Tex. App. 2016).  Cf. Commonwealth v. Beals, 405 Mass. 550, 554-555 (1989) (panoply of "Federal and State statutory schemes to locate a missing child, and have the child returned" do not depend on criminal taking of child [footnote omitted]).  The officer had confirmed that morning that the missing juvenile report was still active, and nothing in the encounter suggested that DCF, the juvenile's legal guardian, had authorized the occupants of the motor vehicle to have custody of him.  That the juvenile was not in evident distress did not require the officer to allow strangers to continue unauthorized custody of a missing juvenile.
     The question, then, is whether the officer's particular actions were "reasonable and consistent" with this purpose.  Sargsyan, 99 Mass. App. Ct. at 116, quoting Knowles, 451 Mass. at 95.  We see nothing unreasonable about removing the missing juvenile from the motor vehicle, transporting him to a police station (but not to a lockup), and then contacting his proper guardian to pick him up.[4]  Indeed, that seems far more reasonable than keeping the juvenile on a public street in a place that the motion judge found was a "high crime area" until some DCF employee could be located to drive there and pick him up.
     The juvenile argues that the officer acted unreasonably because he first should have asked the juvenile whether he needed help, where he was living, whether he had run away, or whether he was related to any of the motor vehicle occupants.  The officer could have done any of those things, but it was reasonable not to engage in this sort of conversation in the middle of a traffic stop in a high crime area in front of a known gang member.  Moreover, it was hardly up to the missing juvenile to decide whether he should be returned to the (presumably) court-ordered custody of DCF.  Cf. Sargsyan, 99 Mass. App. Ct. at 117 (adult's waving police away did not dispel need for community caretaking inquiry).  A child in the custody of DCF does not have the right to return himself to the custody of relatives (much less nonrelatives) on his own initiative, without court involvement.  See Adoption of Rhona, 63 Mass. App. Ct. 117, 126 (2005) (child's custody preferences "not dispositive").  Accordingly, the officer was not free to leave the juvenile with the motor vehicle occupants, no matter what the juvenile might have said.
     The judge found that the officer's failure to engage in such questioning was "by his own admission" in violation of Lawrence police policies.  The officer, however, testified that he complied with the policies and acted in conformity with his training.  The relevant policy, for its part, required "the Investigating Officer or Detective [to] notify the parent or legal guardian of the juvenile's location so that the parent or guardian may retrieve the juvenile" and to question the juvenile as to the juvenile's "whereabouts and activities."  Putting aside that the officer here was not the "Investigating Officer," which the policy describes as the person who interviews the reporting party and conducts an investigation, nothing in this policy suggests that the notification and questioning are supposed to happen immediately, much less in the middle of a traffic stop on a public street in a high crime area in front of a known gang member.
     The more difficult question is whether the officer's patfrisk of the juvenile was reasonable.  See Knowles, 451 Mass. at 95 ("An officer may take steps that are reasonable and consistent with the purpose of his inquiry, even if those steps include actions that might otherwise be constitutionally intrusive" [citation omitted]).  As there is no Massachusetts case on point, we turn to our sister courts for guidance.  See Evans, 436 Mass. at 374-376 & nn.5-7 (examining law of other States to decide whether officer conducting community caretaking may request driver's license and registration).
     The majority, but not unanimous view, is that it is generally reasonable for a police officer transporting a person for community caretaking purposes to pat frisk that person prior to transport.  As the Rhode Island Supreme Court held, in a case involving the transport home of an intoxicated bicyclist, the officer "was justified in determining for himself that before ordering his fellow officer to drive the intoxicated defendant home in a police vehicle, he could be assured that the defendant had nothing on his person that might pose a danger to the life or well being of the driver officer."  State v. Lombardi, 727 A.2d 670, 674 (R.I. 1999) (per curiam).  Accord People v. Tobin, 219 Cal. App. 3d 634, 641 (1990) ("the need to transport a person in a police vehicle in itself is an exigency which justifies a pat-search for weapons"); People v. Gow, 442 P.3d 916, 922 (Colo. Ct. App. 2016), aff'd en banc on other grounds, 439 P.3d 1219, 1221 (2019) ("when an officer has a valid, reasonable basis for placing an individual into a police vehicle that will be occupied by the officer or other persons, the significantly heightened risk of danger to those in the vehicle in the event the individual is armed justifies a pat-down search of the individual for weapons, irrespective of whether the officer has a reasonable, articulable belief that the individual is armed and dangerous"); Caldwell v. State, 985 So. 2d 602, 606 (Fla. Dist. Ct. App. 2008), aff'd on other grounds, 41 So. 3d 188, 204-205 (2010) ("an officer need not have any reasonable suspicion to frisk a person who is about to voluntarily become a passenger in that officer's vehicle"); Williams v. State, 403 So. 2d 453, 456 (Fla. Dist. Ct. App. 1981), review denied, 412 So. 2d 471 (Fla. 1982) ("The officer was not required to gamble his life by placing appellant in the patrol car with him without the precaution of a pat down for weapons"); People v. Queen, 369 Ill. App. 3d 211, 220 (2006) (officer engaging in community caretaking of intoxicated person "was further justified in performing a pat-down search of defendant for safety purposes before transporting him in the squad car"); State v. Varnado, 582 N.W.2d 886, 891 (Minn. 1998), quoting State v. Curtis, 290 Minn. 429, 437 (1971) ("We are not to be understood as holding that police have no right, for their own protection, to search a person before placing him in a squad car if there is a valid reason for requiring him to enter the vehicle and it is not merely an excuse for an otherwise improper search"); State v. Evans, 67 Ohio St. 3d 405, 410 (1993), cert. denied, 510 U.S. 1166 (1994) ("the driver of a motor vehicle may be subjected to a brief patdown search for weapons where the detaining officer has a lawful reason to detain said driver in the patrol car"); State v. Acrey, 148 Wash. 2d 738, 754 (2003) ("Nor did [the juvenile] dispute that the officers were justified in conducting a pat-down search of him before placing him in the patrol vehicle because of officer safety concerns").  Or, as the Michigan courts have explained it, the alternatives of risking harm to the officer or transportee or abandoning the community caretaking task are not preferrable.  See People v. Hannaford, 167 Mich. App. 147, 152 (1988), cert. denied, 489 U.S. 1029 (1989) ("The Fourth Amendment was surely not intended to stand for the proposition that police officers must either abandon civilians on highways or transport them at the risk of personal safety, rather than transport them at reduced risk of personal safety by first subjecting them to a frisk for weapons"); People v. Otto, 91 Mich. App. 444, 451 (1979).  And the risk to the officers' safety is not the only risk; the transportee may pose a risk of self-harm.  See State v. Diloreto, 180 N.J. 264, 278-279 (2004).  But see State v. Shiffermiller, 302 Neb. 245, 265 (2019) (patfrisk limited to reasonable suspicion that person is armed and dangerous even in "a second-tier encounter that is warranted by the community caretaking exception"); State v. Kelsey C.R., 243 Wis. 2d 422, 456 (2001) (requiring reasonable suspicion for patfrisk in community caretaking context but concluding that "a reasonable basis to place someone inside a police vehicle is a factor to be considered in the totality of the circumstances").
     The majority view comports with the Supreme Judicial Court's teaching that actions taken during community caretaking are reasonable where they address "important safety reasons."  Evans, 436 Mass. at 375.  It is also consistent with the Supreme Judicial Court's holding that routine police practices, such as requesting a driver's license and registration, Commonwealth v. Mateo-German, 453 Mass. 838, 843 (2009), and using a cruiser's blue lights are "not 'inconsistent with a routine inquiry requiring no justification.'"  Evans, supra at 373, quoting Commonwealth v. Leonard, 422 Mass. 504, 508, cert. denied, 519 U.S. 877 (1996).  Accordingly, we join the majority of courts and conclude that it is generally reasonable for an officer transporting a person pursuant to a valid act of community caretaking to conduct a patfrisk prior to transport for the officer's and the transportee's safety.
     We need not reach whether such a patfrisk is invariably reasonable, regardless of the characteristics of the missing person.  Here, the juvenile was sixteen years old and in the company of a known gang member in a high crime area.  Where the officer had a valid community caretaking purpose for transporting the juvenile to a police station for retrieval by a legal guardian, nothing about this encounter made the patfrisk unreasonable.
     4.  Child requiring assistance statute.  For the first time on appeal, the defendant argues that the police officer's actions here were forbidden by G. L. c. 119, § 39H.  Although we "may affirm a suppression decision upon any ground supported by the record," Commonwealth v. Martinez, 74 Mass. App. Ct. 240, 244 (2009), here the record is not developed enough to support the application of this statute.
     General Laws c. 119, § 39H, restricts taking a child into "custodial protection for engaging in the behavior described in the definition of 'Child requiring assistance' in section 21" to situations where the child has failed to obey a court summons or there is "probable cause to believe that such child has run away from the home of his parents or guardian and will not respond to a summons."  G. L. c. 119, § 39H, first par.  Section 21, in turn, defines a "[c]hild requiring assistance" as a child who repeatedly runs away, repeatedly fails to follow reasonable commands by a guardian, repeatedly fails to follow school rules, is habitually truant, or is sexually exploited.  G. L. c. 119, § 21.  Upon proper application and proof at a hearing, a court may determine that such a child is a "child requiring assistance" and place the child in the custody of a qualified adult, childcare agency, private organization, or DCF.  G. L. c. 119, § 39G, fourth par.
     Here, no evidence was provided on the applicability of or compliance with this statute.  There is simply no evidence that the officer decided to transport the child for "engaging in the behavior described in the definition of 'Child requiring assistance.'"  G. L. c. 119, § 39H, first par.  There is similarly no evidence whether the juvenile failed to obey a child requiring assistance summons or whether the officer had reason to believe that the child would not obey such a summons.  The Commonwealth had no reason to present any such evidence, as the juvenile raised no claim under § 39H in the Juvenile Court.  We may not adjudicate a suppression issue raised for the first time on appeal where "the record before us [is] incomplete and inadequate because the Commonwealth was not put on notice that it needed to present evidence concerning" that issue.  Commonwealth v. Santos, 95 Mass. App. Ct. 791, 798 (2019).  Accord Commonwealth v. Brule, 98 Mass. App. Ct. 89, 92 (2020).
     Moreover, it is far from evident what "custodial protection" is and whether the juvenile was subjected to it simply by being removed from a motor vehicle and pat frisked.  The term is not defined in the statute.  It was inserted by the Legislature in 2012, when the Legislature replaced the term "arrest" with "custodial protection," St. 2012, c. 240, §§ 24-26, 28-29, suggesting that "custodial protection" is something more like an arrest and less like merely returning a missing juvenile to that juvenile's lawful guardian.  To the extent that the juvenile argues that the Legislature has categorically barred returning missing juveniles to their guardians without "a 
chance . . . to show up to court to discuss why they ran away," we find that an implausible proposition.
Order allowing motion to suppress reversed.
footnotes

     [1] General Laws c. 119, § 60A, directs us that "[t]he records of a youthful offender proceeding conducted pursuant to an indictment shall be open to public inspection" and that "records of the court in cases of delinquency . . . shall be withheld from public inspection."  See Doe v. Attorney Gen. (No. 1), 425 Mass. 210, 213 (1997).  The statute does not inform us what to do when, as here, the case involves both a youthful offender proceeding and a delinquency proceeding.  The practices of both this court and the Supreme Judicial Court have been inconsistent.  Compare Makis M. v. Commonwealth, 494 Mass. 23, 24 (2024); Commonwealth v. Taron T., 104 Mass. App. Ct. 219, 220 (2024), with Commonwealth v. Murungu, 450 Mass. 441, 443 (2008); Commonwealth v. Jeudy, 75 Mass. App. Ct. 579, 579 (2009).  As suggested by the Committee for Public Counsel Services (whose amicus letter we gratefully acknowledge), we follow the safer course of using a pseudonym here.
     [2] The motion judge reasonably found that this report about a firearm was of no consequence, as "[t]he officer did not have specific, temporally proximate information to suggest that [the individual] was in possession of a firearm.  He did not know the date of the post, the platform it was posted on, how long it had been posted, or what was depicted in the post."
     [3] The juvenile does not dispute the validity of the traffic stop.  See Commonwealth v. Amado, 474 Mass. 147, 151 (2016), quoting Commonwealth v. Santana, 420 Mass. 205, 207 (1995) ("Where the police have observed a traffic violation, they are warranted in stopping a vehicle").
     [4] Although the officer did contact DCF after bringing the juvenile to the police station, the juvenile was held without bail pursuant to G. L. c. 276, § 58A, based on the criminal charges and thus not returned to DCF's custody until April 2023.