NOTICE: Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale. Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent. See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

24-P-544

COMMONWEALTH

vs.

NAJAE L. NICHOLS.

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The Commonwealth files this interlocutory appeal from an order allowing the motion to suppress of the defendant, Najae L. Nichols. The Commonwealth argues that the motion judge erred by (1) finding Officer Nicholas Hultine's continued questioning of the defendant after he denied the need for medical assistance ripened into a seizure and was not justified under the community caretaking function; and, by (2) considering Hultine's purported racial bias in evaluating the above. We reverse.

Background. The following facts are drawn from the judge's findings and from undisputed facts in the record that she implicitly credited. See Commonwealth v. Tremblay, 480 Mass.

645, 654-655 (2018); Commonwealth v. Jones-Pannell, 472 Mass. 429, 436 (2015).

On June 17, 2023, Hultine was on patrol in the city of Chicopee. At approximately 5:45 A.M., he and another officer were dispatched to a gasoline station because of a report of two men asleep in a vehicle parked at a gasoline pump since 2 A.M. According to the dispatch, gasoline station employees had unsuccessfully attempted to wake the men before calling the police. Once the officers arrived at the gasoline station, they found the vehicle parked at the pump with the ignition off. The officers could see that the man in the driver's seat was slumped over to the right with his head tilted towards the passenger's side. The defendant was seated upright in the passenger seat with his eyes closed. Both occupants were breathing.

After approaching the vehicle and observing the men inside, the officers tapped on the windows but failed to rouse either occupant. The other officer opened the driver's side door, but again neither occupant woke up. Hultine subsequently opened the passenger door, which finally roused the two men. Hultine then spoke with the defendant, while the other officer spoke with the driver. Hultine asked the defendant if he was all right. The defendant responded that he was just sleeping. Hultine then asked if the defendant or the driver needed any medical

attention.  The defendant again stated that they were fine, and that they were just tired and needed some sleep.

Given the circumstances, Hultine continued to ask the defendant a few more questions to identify him and ensure that he did not actually require medical attention.[1]  As he spoke with the defendant, he observed that the defendant appeared to be nervous and began fidgeting.  Shortly thereafter, Hultine looked down and saw a firearm lying under the defendant's legs on the floorboard of the car.  Hultine ordered the defendant not to move while he retrieved the gun and cleared it from the vehicle.  Once he cleared the firearm, Hultine ordered the defendant out of the vehicle and detained him for officer safety purposes pending further investigation.  Hultine then asked the defendant for his license to carry a firearm, but the defendant said he did not have one.  Next, Hultine asked the defendant to whom the gun belonged, and the defendant admitted that it was his.

Hultine informed the defendant he was under arrest and transported him to the Chicopee police station for booking.  The driver was advised that he was free to leave with the vehicle.  The defendant was subsequently charged in District Court with carrying a firearm without a license, in violation of G. L.

---

[1] The motion judge did not make findings as to what Hultine asked the defendant after he declined needing medical attention. We therefore rely on Hultine's responses to the judge's questions at the motion hearing on this topic.

c. 269, § 10 (n), and possession of ammunition without an firearm identification card, in violation of G. L. c. 269, § 10 (h) (1). The defendant moved to suppress the firearm, as well as the statements he made to police, arguing that he was seized when Hultine opened the passenger door, or, in the alternative, when Hultine continued to question him after he said that he did not require medical attention. A judge of the District Court allowed the defendant's motion, concluding that Hultine's continued questioning of the defendant after he said he did not need medical attention was not justified under the community caretaking function and ripened into a seizure. We reverse.

Discussion. "In reviewing a decision on a motion to suppress, we accept the judge's subsidiary findings absent clear error but conduct an independent review of [the] ultimate findings and conclusions of law" (quotations and citations omitted). Jones-Pannell, 472 Mass. at 431. Here, the Commonwealth argued Hultine's questions to the defendant preceding his order to step out of the vehicle were reasonable pursuant to the community caretaking function and did not amount to an unjustified seizure. We agree.

The Fourth Amendment to the United States Constitution and art. 14 of the Massachusetts Declaration of Rights "protect individuals from unreasonable, governmental searches and

4

seizures."  Commonwealth v. Delgado-Rivera, 487 Mass. 551, 554 (2021).  A warrantless search is per se unreasonable unless it "falls within a narrow class of permissible exceptions to the warrant requirement" (quotations and citations omitted). Commonwealth v. Perkins, 465 Mass. 600, 603 (2013).  The community caretaking doctrine, which provides one such exception, allows police officers to, inter alia, "provid[e] aid to motorists," Caniglia v. Strom, 593 U.S. 194, 199 (2021), so long as their actions are "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." Commonwealth v. Evans, 436 Mass. 369, 372 (2002), quoting Cady v. Dombrowski, 413 U.S. 433, 441 (1973).  See Commonwealth v. Demos D., 105 Mass. App. Ct. 193, 196 (2025).  "In carrying out this [caretaking] function, an officer may, when the need arises, stop individuals and inquire about their well-being, even if there are no grounds to suspect that criminal activity is afoot." Commonwealth v. Knowles, 451 Mass. 91, 94-95 (2008).  "An officer may take steps that are reasonable and consistent with the purpose of his inquiry, even if those steps include actions that might otherwise be constitutionally intrusive" (citations omitted). Id. at 95.  "The decision to make a well-being check must be reasonable in light of an objective basis for believing that the

defendant's safety and well-being or that of the public may be in jeopardy." Id.

Here, there is no dispute that the officers had an objective basis for believing that the defendant's well-being or the safety of the public was in jeopardy when they arrived at the gasoline station. The defendant and the driver were sound asleep in a vehicle parked at a gasoline pump for over three hours and could not be roused by the gasoline station employees, who ultimately resorted to calling the police. The officers still had this objective basis when they tapped on the windows of the vehicle, and the occupants failed to respond, and when they opened the driver and passenger side doors, before the occupants finally woke up. See Commonwealth v. Leonard, 422 Mass. 504, 506-509 (1996) (reasonable suspicion not required for officer to open car door where motorist was parked in breakdown area at 1 A.M. and was unresponsive to persistent attempts to wake her).

Given the circumstances surrounding the encounter, including, inter alia, the length of time the occupants had been asleep at a gasoline pump of an open gasoline station, and the challenges the gasoline station employees and police had in waking them, Hultine possessed an objective basis for believing the defendant's well-being was in jeopardy even after the defendant told Hultine that he did not require medical

6

attention.  Indeed, in conducting a well-being inquiry pursuant to the community caretaking function, Hultine was certainly not required to take the defendant's responses at face value in a situation such as this.  Cf. Knowles, 451 Mass at 95. For example, as Hultine testified at the motion hearing, "individuals who have been overdosing, they always state that they're okay, and they don't need medical assistance when we have to make the determination whether or not they are okay, or they do need medical . . . [i]ntervention."  Notably, Hultine questioned the defendant for a very short time before he saw the firearm, and his questions only concerned the defendant's well-being.  See Evans, 436 Mass. at 372-373 (no reasonable suspicion necessary for officers to conduct inquiry "divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute" [citation omitted]).

As such, because the entirety of Hultine's inquiry preceding the order to step out of the vehicle was reasonable under the community caretaking function, the defendant's motion should have been denied.  Knowles, 451 Mass at 94-95. Accordingly, the judge's order allowing the defendant's motion to suppress is reversed.[2]

---

[2] We agree with the defendant that the motion judge's concerns about Hultine's alleged racial bias, which was purportedly evidenced by a statement he made at a Board of Selectman meeting completely unrelated to the defendant's case,

7

So ordered.

By the Court (Desmond,
  Grant & Hodgens, JJ.[3]),

*Paul Little*

Clerk

Entered:   June 23, 2025.

---

did not impact her decision on the defendant's motion.  As the defendant states,

> "The Commonwealth makes much of the motion judge's concerns about Officer Hultine's potential bias. . . .  However, the motion judge's concerns were ultimately irrelevant to her conclusion that Officer Hultine's community caretaking function had been satisfied, and that the seizure had been unnecessarily prolonged when the gun was discovered. . . . [T]he motion judge made only [a] passing reference to the statement in two footnotes, and none of her findings or reasoning rest on this point.  As a result, they are immaterial to her ruling on [the defendant's] motion to suppress."

[3] The panelists are listed in order of seniority.